2004 SD 84

**Wallace ADRIAN, Plaintiff and Appellee,**

v.

**Rich McKINNIE and Lynn McKinnie, Defendants and Appellants,**

**Citibank (South Dakota), NA, and Adrian Ranch, L.L.C., Defendants.**

**No. 22860.**

Supreme Court of South Dakota.

Considered on Briefs April 26, 2004.

Decided June 30, 2004.

Michael A. Wilson of Barker, Wilson, Reynolds & Burke, Rapid City, South Dakota, Attorneys for plaintiff and appellee.

Kenneth R. Dewell of Pechota, Leach & Dewell, Rapid City, South Dakota, Attorneys for defendants and appellants.

MEIERHENRY, Justice.

[¶ 1.] This case is before us for the second time. In the first case, we de-

termined that the parties' contractual agreement was an equitable mortgage and reversed and remanded for further proceedings. On remand, Wallace Adrian (Adrian) sought foreclosure of the equitable mortgage. The trial court granted judgment in favor of Adrian, including interest and attorney's fees. Borrowers, Lynn and Rich McKinnie (McKinnies) dispute the amount of interest and attorney's fees owed. McKinnies appeal. We reverse.

## FACTS

[¶ 2.] McKinnies originally appealed to this Court in *Adrian v. McKinnie*, 2002 SD 10, 639 N.W.2d 529 (*Adrian I*). Adrian had sued McKinnies to terminate a lease agreement and option to purchase; McKinnies had sued Adrian for specific performance of the option to purchase. The trial court found McKinnies in breach and entered judgment for Adrian.[1] On appeal, this Court determined that the instrument in question, although entitled a lease agreement and option to purchase, was actually an equitable mortgage. Therefore, McKinnies owned the land, and, as lender, Adrian only possessed a security interest. Further, in *Adrian I*, we addressed McKinnies' specific performance claim, stating:

> Lastly, Adrian contends that the trial courts finding that the McKinnies acted with unclean hands disentitles them to equitable relief. When claimants seek equitable relief in an instance where

they would ordinarily be permitted such relief, they will nonetheless be denied the relief if they acted improperly or unethically in relation to the relief they seek. Dobbs, Law of Remedies, § 2.4 (1973). Unrelated misconduct will not bar relief: "What is material is not that the plaintiff's hands are dirty, but that he dirties them in acquiring the right he now asserts." *Republic Molding Corp. v. B.W. Photo Utilities*, 319 F.2d 347, 349 (9thCir.1963). No matter how wrong the McKinnies may have been in taking excess timber off the land, those acts have nothing to do with how the agreement here was formed. The trial court's unclean-hands finding will not bar equitable relief.

*Id.* at 17, 639 N.W.2d 529. The case was reversed and remanded. On remand, Adrian filed an amended complaint for foreclosure, claiming McKinnies were in default. McKinnies failed to answer and a default judgment was entered. McKinnies filed a motion to set aside the default judgment and to be permitted to file an Answer. The trial court granted McKinnies' motion.

[¶ 3.] A court trial was held after which the trial court concluded that McKinnies waived their claim for specific performance. Additionally, the court found McKinnies in default and foreclosed the mortgage. The court determined that redemption included the following:

| | |
|---|---|
| Principal | $122,327.38 |
| Interest on principal (December 1, 1999 until date of judgment) | $ 38,910.16 |
| Attorney's fees (original action and foreclosure action) | $ 18,862.75 |
| 1999 Real estate taxes | $ 748.38 |
| Interest on taxes | $ 207.87 |
| 2000 Real estate taxes | $ 794.12 |
| Interest on taxes | $ 140.61 |
| Total for Redemption | $181,991.27 |

---

1. Judge Fitzgerald conducted the first trial. Due to his illness, Judge Tice was assigned the case and he conducted the second trial.

[¶ 4.] McKinnies claim that the court's redemption amount is in error. McKinnies claim they should not owe Adrian interest after May 10, 2000 or attorney's fees. First, they claim that they tendered payment on May 10, 2002, which, under SDCL 20–5–18, stopped the interest running as of that date.[2] Second, they claim that they should not be assessed attorney's fees as to the first action to terminate the lease/option in *Adrian I* because the agreement of the parties did not provide for attorney's fees nor are attorney's fees for such an action authorized by statute. McKinnies further argue that their request for specific performance should have been granted eliminating Adrian's entitlement to attorney's fees under SDCL 15–17–38.[3] McKinnies offer the following accounting:

| | |
|---|---|
| Principal | $122,327.38 |
| Interest on principal (December 1999 to May 11, 2000) | $ 5,428.62 |
| 1999 Real estate taxes | $ 748.38 |
| 2000 Real estate taxes | $ 794.12 |
| Total | $129,298.50 |

[¶ 5.] The difference between the court's judgment of $181,991.27 and McKinnies' accounting of $129,298.50 is the subject of this appeal. McKinnies paid and Adrian received $129,298.50. McKinnies placed an additional $62,527.37 with the clerk of courts that has been deposited in an interest bearing account. McKinnies concede that if this Court denies their request for specific performance and concludes that Adrian was entitled to a decree of foreclosure, reasonable attorney's fees, sales tax, and costs totaling $5,366.46 would be proper. However, they claim that under no theory should they be assessed attorney's fees for the first action. McKinnies also contest interest on the taxes Adrian paid.

## STANDARD OF REVIEW

[¶ 6.] A trial court's findings of fact will not be set aside unless they are clearly erroneous. *Estate of Fisher*, 2002 SD 62, ¶ 10, 645 N.W.2d 841, 844 (citation omitted). A trial court's conclusions of law are given no deference under a de novo review. *Id.* A trial court's award of attorney's fees is reviewed for abuse of discretion. *Osgood v. Osgood*, 2004 SD 22, ¶ 9, 676 N.W.2d 145, 148.

## ISSUES

I. Whether McKinnies tendered payment to Adrian, which was refused, thereby obviating the payment of interest on the unpaid principal balance.

II. Whether the trial court erred in its determination of the time period interest was assessed.

III. Whether McKinnies were entitled to specific performance under the equitable mortgage so as to allow them to make payment and receive the warranty deed.

IV. Whether Adrian was entitled to attorney's fees.

---

2. SDCL 20–5–18 provides: "An offer of payment or other performance, duly made, though the title of the thing offered be not transferred to the creditor, stops the running of interest on the obligation, and has the same effect upon all its incidents as a performance thereof."

3. SDCL 15–17–38 provides in part: "Attorneys' fees may be taxed as disbursements on mortgage foreclosures either by action or by advertisement."

## DECISION

*Tender of Payment*

[¶ 7.] Since both issues I and II involve the question of when McKinnies tendered payment, they will be discussed jointly. The issue whether payment was tendered during the 30 day period under the option to purchase is no longer relevant because of our ruling in *Adrian I* and, therefore, not before us. Rather, the issue is whether McKinnies tendered payment prior to foreclosure. McKinnies argue that once they received the title policy, May 9, 2000, they were ready, willing, and able to pay. SDCL 20–5–10.

[¶ 8.] The trial court, on remand, determined that McKinnies had not tendered payment. *See* SDCL 20–5 et seq. The trial court entered the following findings:

(1) "[t]hat despite claiming to have funds needed to purchase the property, McKinnies failed to tender payment or propose to close on the property by May 3, 2000." (FF 12).[4]

(2) "McKinnies never tendered payment of the appropriate amount payable under the contract before May 8, 2000." (FF 28).[5]

(3) "McKinnies never made a tender of payment which was unconditional. Money placed in Vander Heide's trust account was not releasable to Adrian without condition." (FF 52).

(4) "McKinnies never made a tender of payment for the full amount which included the sum of $122,327.38 plus prorated rental payments which were required to be paid under the contract." (FF 53).

(5) "[t]he issue of tender was fully litigated between these same parties in the first trial and was decided." (FF 54).

The trial court concluded that "McKinnies did not make sufficient tender, and the doctrine of the law of the case also supports that finding, and this Court finds that McKinnies never did make sufficient tender."

[¶ 9.] The trial court's Findings of Fact must be supported by the evidence and Conclusions of Law must in turn be supported by the Findings of Fact. The first finding of fact listed *supra* is based on the 30 day time period in the Option to Purchase provision. As previously noted, whether payment was tendered under the option is no longer relevant. Therefore, the trial court's finding is clearly erroneous. The second finding is also based on the option time period and is irrelevant for the same reason as finding (1). The third finding that the tender of payment was conditional is likewise in error. The evidence reveals that the title policy was issued May 9 and that funds were available at that time. SDCL 20–5–9. The fourth finding that McKinnies never tendered the full amount owed is also erroneous. McKinnies stated that the amount they owed was the balance due according to Schedule A of their agreement with Adrian plus accrued interest until closing. McKinnies never denied they owed interest nor did they characterize the Schedule A balance as payment in full. The evidence shows that at the time McKinnies gave notice of their intent to exercise the purchase option April 3, 2000, the December 1999 payment had been made. Schedule A of the parties' agreement states:

Amount of option price if exercised on the following dates:

. . .

After 12-01-99 and before 06-01-00    $122,327.38

. . .

---

4. This finding is also stated in the Findings of *Adrian I* (finding 12).

5. This finding is also stated in the Findings of *Adrian I* (finding 29).

Therefore, $122,327.38 was the balance due as of the December 1, 1999 payment. Because McKinnies attempted to exercise their purchase option in April of 2000, they owed $122,327.38 plus interest at ten percent up to closing.[6] Further, McKinnies' complaint dated May 10, 2000 states that upon delivery of the warranty deed, they would pay $122,327.38 plus prorated rental payments. The parties agree that the prorated rental payments and the ten percent interest are the same. Finally, the trial court's fifth finding that the issue of tender was fully litigated in *Adrian I* and was the law of the case is clearly erroneous. Again, the court focused only on the option time period. On remand, the court should have analyzed whether McKinnies had tendered payment under the foreclosure action rather than under the lease/purchase action litigated in *Adrian I*.

[¶ 10.] Based on the record, the facts show, McKinnies tendered payment prior to foreclosure. "The word 'tender' is generally defined as an unconditional offer of payment consisting in the actual production of a sum not less than the amount due on a specific debt or obligation." 60 AM-JUR 2d *Payment* § 4 (2003). Correspondence between the parties' attorneys indicated McKinnies made an unconditional offer to pay the amount due.

*Offer of payment*

[¶ 11.] On April 3, 2000, McKinnies' attorney sent a letter to Adrian's attorney communicating McKinnies' intent to pay the amount due, it read:

April 3, 2000

This letter is to serve as formal notice of Mr. & Mrs. McKinnie's intent to exercise their option pursuant to the agreement between the parties dated October 10, 1997 with a purchase amount of $122,327.38. I expect to have the funds in my office trust account by Monday, April 03, 2000, after which I will contact you and schedule a time to meet with you at your office. Please prepare a Warranty Deed and Certificate of Real Estate Value for Mr. Adrian's signature and, since Mr. Adrian is a married man, I would ask that the Warranty Deed contain "homestead waiver" language thereby negating the necessity of his wife having to sign the documents.

On April 7, 2000, Adrian's attorney responded alleging that McKinnies were in default and demanding payment within 30 days.[7] The letter read:

. . .

This letter serves as notice of default of the terms and conditions of the Lease Agreement and Option to Purchase.... If the default is not cured within 30 days from the date of this notice, the Lease Agreement and Option to Purchase terminates by operation of the terms of the contract.... The contract provides that he must pay the sum of $122,327.38, plus pro rated rental payments within 30 days of the date of your letter. Anticipating that Mr. McKinnie will be making that payment, and thereby rendering the default moot, I have sent a deed to Mr. Adrian for his execution....[8]

6. The option to purchase clause states in part that the Lessees may purchase the real property "for the purchase price as reflected on Schedule A." Five lines later it states, "[i]n the event that the option is exercised, any rental payments shall be prorated to the date of closing."

7. The letter notes that it "follows my phone conversation with you on Thursday, April 6."

8. The letter notes that the "pro rated rent should be computed based on a daily rental of $61.85." However, the parties agree that $61.85 is in error and that the correct amount is $33.51.

Adrian's attorney wrote another letter April 24, 2000 stating that if the purchase was not closed on or before May 3, 2000, "the lease agreement and option to purchase will be terminated on May 7, pursuant to the terms of the contract and my Notice of Default dated April 7." On May 1, 2000, McKinnies' attorney responded that the loan payoff was delayed because of computer problems at the title company but that payoff would occur as soon as the title policy issued. The letter responded as follows:

> This letter is to follow-up on our telephone discussion of last week wherein I indicated to you that we were prepared to close on the loan necessary in order to pay-off the amount owing to Mr. Adrian, however due to computer problems with Custer Title Company, we are unable to obtain a lender policy in time to close prior to May 3rd.... As I have indicated, the McKinnies have a lender who has escrowed the funds with attorney Tim Vander Heide and all parties are prepared to close the loan once the title policy has been issued.... It would appear very imprudent for Mr. Adrian to refuse in excess of $122,000.00 and gamble on a "default" that is thin at best and has a minimal chance of success on the merits.... I urge you to visit with your client and carefully weigh the economics of this situation and encourage him to agree to an extension in order to allow the loan to close and Mr. Adrian to receive the monies that are due to him....

On May 8, 2000, Adrian's attorney wrote to McKinnies that Adrian was serving a Notice to Quit. It further stated that "Mr. Adrian will not allow Mr. McKinnie to exercise the option to purchase and will proceed to evict ..." It is clear that the sole basis for Adrian's refusal to release the deed was that he was acting under his belief that the contract was a lease/purchase agreement rather than an equitable mortgage agreement and that McKinnies were required to pay the balance within the 30 days.

*Availability of Amount Owed*

[¶ 12.] In addition to McKinnies' stated intent to pay the amount owed, they also had the money available. In an affidavit, dated July 24, 2000, Walker Witt of Bakewell, Vander Heide & Witt law firm, testified that the money was escrowed. His testimony was as follows:

> (1) That prior to May 3, 2000, affiant's law firm received from the [McKinnies] monies sufficient to satisfy all monetary obligations necessary to complete the purchase of the real estate by the [McKinnies] from [Adrian] at closing.
> (2) That the above-mentioned monies were placed in escrow to be released upon closing.
> (3) That the monies remained in the escrow account and was [sic] available for closing on and after May 10, 2000, the date the title insurance policy was available, and said monies remain available for closing at any time.

In Adrian's deposition dated July 31, 2000, the following exchange occurred [9]:

> Q. Okay. Go through this real quick here. Going back to this default situation here, you were assured by Mr. Porter that the money was in existence at Tim Vander Heide's account in Custer, South Dakota for payment of the payoff on this contract. Were you advised of that?
> A. Yes, I was advised that it was there, but I had no proof that it was there.
> Q. What kind of proof did you want?
> A....

---

9. The entire record of *Adrian I* was entered as substantive evidence in the foreclosure case.

And yes, I heard that somebody had put some money in there, but nobody offered to check, nobody said here's a dollar to seal the contract, nobody did anything. I heard that it was there and that's all.

Q. But you elected not to believe that?

A. Well, from past experience I figured no.

Q. Well, in past experience had attorneys ever represented to you that his attorneys had the money in their accounts?

A. Well, when they did, it was past due. He had 30 days to do it and it didn't happen.

[¶ 13.] At the court trial in *Adrian I* on August 4, 2000, a few days after Adrian was deposed, he testified as follows:

Q. Okay. Okay. The money's in escrow now. Why won't you take it?

A. Because the contract is broken.

Q. That's the only reason why?

A. Well, he defaulted on it. That's what the contract says.

Q. Okay.

A. Says you can terminate it when the default is not cured and that's what I did.

. . .

Q. Okay. And so the only reason that you have for not taking the money is that he just broke the contract and that's it?

A. Yes, he broke the contract.

. . .

Q. Okay. But my question is, the reason you won't take the money is just because he broke the contract and, therefore, is out of luck, right?

A. Yes, I—

Q. What's the problem—

A. The whole agreement should be terminated because that's what the—that's what the agreement says.

At the hearing after the remand of *Adrian I*, Adrian persistently claimed that McKinnies had breached the contract by cutting timber and had defaulted by not paying within 30 days from the notice of default. Adrian continued to refuse McKinnies' offer of full payment.

*Tender—Unconditional*

■ [¶ 14.] Once the money was available to McKinnies, their offer was unconditional. For tender of payment under SDCL 20–5–18 to toll interest, "the tender must be unconditional." *Schmidt v. Iowa Beef Processors, Inc.,* 347 N.W.2d 897, 898 (S.D.1984). Once the title policy issued, the funds were available. Further, the availability of funds pending issuance of a title policy is not "conditional" as that term has been used in prior opinions. In *Schmidt*, the "offer to deposit . . . carried with it the condition that IBP be released from any liability arising from the lawsuit." *Id.* IBP was asking for something in addition to its agreement with Schmidt. In contrast, the McKinnies did not impose an additional requirement on Adrian; rather, they were merely engaging in a common process—acquiring title insurance—for closing on real property.[10] *See* SDCL 20–5–9.

■ [¶ 15.] An unconditional tender must be sufficient to discharge the liability. *Dougherty v. Beckman,* 347 N.W.2d 587, 591 (S.D.1984). In *Dougherty*, the purchaser offered a lesser amount than the seller claimed was due. The parties disagreed to the amount due under their agreement. The purchaser offered a lesser amount as *final payment. Id.* The seller "articulated [its] objection to the

___

10. The parties' agreement was for a warranty deed.

tender and returned the money." *Id.* We concluded that tendering a lesser amount as full payment was a conditional tender and was insufficient to toll the interest. Here, McKinnies offered to pay off the Schedule A balance of $122, 327.38 plus interest (pro-rated rental payments) as payment in full. In fact, they acknowledged in their May 10, 2000 complaint that they were willing, ready and capable of paying off the balance and pro-rated rental payments. Further, Adrian did not reject McKinnies' tender because the amount was in dispute; Adrian rejected it because it was not tendered within the 30 day time period of the option to purchase and because Adrian wanted the land. SDCL 20–5–15.

[¶ 16.] Adrian's deposition and trial testimony clearly indicate that he rejected McKinnies' tender. The law does not require futile acts. *Herron v. Fox,* 67 S.D. 36, 288 N.W. 459 (1939). With regard to tender,

> if the tenderee makes any declaration which amounts to a repudiation of the contract, or takes any position which would render a tender, as long as the position taken by him is maintained, a vain and idle ceremony, as where he expressly declares that he will not accept the tender if it is made, or where he makes clear that he will not perform . . . or in any other way obstructs or prevents a tender, as by . . . admitting that a tender would be fruitless, by denying the existence of a binding contract, [or] by declaring the contract to be at end [tender is waived].

86 CJS *Tender* § 6 (1997). *Stanley v. Pilker,* 40 S.D. 403, 167 N.W. 393 (1918) (party was "released [ ] from the useless act of making any further tender"); *Warren v. M. Samuels & Co.,* 57 S.D. 105, 230 N.W. 807 (1930) (party stated that tender would not have been accepted therefore "the making of such tender would have been a wholly useless act"); *McPherson v. Fargo,* 10 S.D. 611, 74 N.W. 1057 (1898) (party did not have to tender because other party stated that he was no longer bound to the contract). Adrian's deposition and trial testimony clearly show he rejected McKinnies' tender and that he would have continued rejecting it. *See Pittman v. Pomeroy,* 552 So.2d 983, 992 (La.App.1989) (party admitted that tender of purchase price would have been refused). His rejection was based solely on his belief that McKinnies had broken the contract and that he had no obligation to accept the payoff and release the deed. Adrian did not object to the sufficiency of the tender. Objections to tender must be made at the time of tender or they are waived. SDCL 20–5–15; *Am. Fed. Sav. and Loan Ass'n of Madison v. Mid–America Serv. Corp.,* 329 N.W.2d 124, 127 (S.D. 1983); SDCL 20–5–14. McKinnies, through their counsel, attempted to pay off their debt to Adrian; Adrian refused the tender.

*Interest on Mortgage*

[¶ 17.] Based on the correspondence between the parties' attorneys, Adrian's own testimony that he refused to accept payment, and proof that $200,000 was in escrow, an amount more than adequate to pay off Adrian; we conclude that McKinnies tendered payment as of May 10, 2000. In a similar case we held "that upon tender of the full payment [tenderer] was entitled to a warranty deed free and clear of any claims or conditions." *Fisher,* 2002 SD 62 at ¶ 28, 645 N.W.2d 841, 849. When McKinnies tendered payment on May 10, 2000, interest stopped running. Adrian chose to test the validity of McKinnies' right to pay off the balance; that choice, however, did not entitle him to receive interest after he rejected their offer of payment.

*Interest on Property Taxes*

██ [¶ 18.] The trial court assessed interest on the property taxes Adrian had paid. The court's figure is the date paid to the day of judgment. When McKinnies tried to pay the 1999 taxes, they discovered that Adrian had already paid them.[11] Adrian also paid the 2000 taxes. As part of the prior appeal, McKinnies posted a bond to cover the taxes. Adrian paid the taxes in anticipation of being awarded the land. *Adrian I* determined he did not own the land. By paying the taxes Adrian prevented McKinnies from doing so. McKinnies should not be required to pay interest on taxes that they were ready, willing and able to pay but prevented from paying. Adrian took the risk of paying the taxes. He had no obligation to pay the taxes. It was error for the trial court to award interest to Adrian.

*Attorney's Fees*

██ [¶ 19.] Generally, "attorney fees may only be awarded by contract or when specifically authorized by statute." *O'Connor v. King*, 479 N.W.2d 162, 166 (1991). Attorney's fees are statutorily authorized in mortgage foreclosures. SDCL 15–17–38. Adrian's request for attorney's fees was for the foreclosure action in the second trial. As part of the second trial, Adrian attempted to retry the issue of whether McKinnies had breached the contract by cutting timber. This Court disposed of that issue in the first appeal. Nevertheless, the trial court found "[t]he litigation conducted before Judge Fitzgerald concerned one dominating issue: whether McKinnies breached the agreement by taking timber." (FF58). The trial court determined that since Adrian's fore-

closure complaint again alleged that McKinnies were in default for wrongfully taking lumber, "the evidence of breach presented at the first trial was relevant to prove breach in the second trial." (FF59). Consequently, the trial court awarded attorney's fees to Adrian in the amount of $18,862.75. Of that amount, $5,336.46 was attributable to the second trial, the rest were fees accrued as part of the first trial on issues improperly resubmitted in the second trial.

██ [¶ 20.] The trial court erred in its consideration of attorney's fees. Because we have determined that McKinnies had tendered payment on May 10, 2002, any further action by Adrian was unnecessary. Had he accepted the payment as tendered, he would not have incurred additional attorney's fees for the foreclosure. Despite this Court's direction concerning the irrelevancy of the cut timber, Adrian continued to press the issue by filing a foreclosure action. He should not receive attorney's fees for a foreclosure action created by his own refusal to accept tender.

[¶ 21.] Consistent with the resolution of the issues herein, the judgment of foreclosure is reversed and we remand to the trial court for proceedings consistent with this opinion.

[¶ 22.] GILBERTSON, Chief Justice, and SABERS, KONENKAMP, and ZINTER, Justices, concur.

---

11. Tax notices were sent directly to Adrian. Adrian testified that he did not give the no-

tices to McKinnies.